## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **MARIA YOLANDA CHAVEZ, INDIVIDUALLY AND ON BEHALF OF MINOR LC AND ESTATE OF JOSE ANGEL CHAVEZ, AND ANGEL CHAVEZ; RITA ELAINE COWAN, INDIVIDUALLY AND ON BEHALF OF ESTATE OF THOMAS DAVID COWAN,** | § § § § § § § § | **NO. 3:21-cv-01184** |
| **Plaintiffs,** | § § § | |
| **vs.** | § § | |
| **TYSON FOODS, INC. D/B/A TYSON FOODS; TYSON FRESH MEATS, INC.; TRANSPLACE TEXAS, LP.; AXIOM MEDICAL; COMMUNITY CARE NETWORK, LLC D/B/A MATRIX MEDICAL NETWORK,** | § § § § § § § § | |
| **Defendants.** | § § | |

# DEFENDANTS TYSON FOODS, INC. AND TYSON FRESH MEATS, INC.'S
# <u>RESISTANCE TO MOTION TO REMAND</u>

### Oral Argument Requested

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 3

    A.    The Complaint and motion to remand ......................................... 3

    B.    Federal "critical infrastructure" designation and collaboration with federal officers to continue operations. ......... 4

    C.    The April 28 Executive Order invoking the Defense Production Act. ......................................................................... 10

ARGUMENT ...................................................................................................... 12

    I.    This Court has jurisdiction under the federal officer removal statute. ......................................................................... 12

        A.    Tyson acted under the direction of federal officers. .................. 13

        B.    There is a sufficient nexus between Tyson's actions and federal directions. ..................................................... 17

        C.    Tyson has colorable federal defenses. ....................................... 19

    II.    The Court has federal question jurisdiction because Plaintiffs' claims necessarily raise substantial and disputed issues of federal law. ......................................................................... 24

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co.*,
  850 F.3d 714 (5th Cir. 2017) ............................................................................ 24, 25

*Bell v. Thornburg*,
  743 F.3d 84 (5th Cir. 2014) ...................................................................................... 19

*Betzner v. Boeing Co.*,
  910 F.3d 1010 (7th Cir. 2018) .............................................................................. 2, 13

*Boyle v. United Technologies Corp.*,
  487 U.S. 500 (1988) ...................................................................................................... 24

*CRGT, Inc. v. Northrop Grumman Sys. Corp.*,
  Civ. A. No. 1:12-cv-554, 2012 WL 3776369 (E.D. Va. Aug. 28, 2012)................. 17

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000) ...................................................................................................... 23

*E. Air Lines, Inc. v. McDonnel Douglas Corp.*,
  532 F.29 957, 993 (5th Cir. 1976) ................................................................... 17, 23

*Fernandez v. Tyson Foods, Inc.*,
  No. 20-CV-2079-LRR, 2020 WL 7867551 (N.D. Iowa Dec. 28, 2020) ................. 14

*Fields v. Brown*,
  No. 6:20-cv-00475, 2021 WL 510620 (E.D. Tex. Feb. 11, 2021).................... passim

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
  545 U.S. 308 (2005) .............................................................................................. 24, 25

*Grocery Mfrs. of Am., Inc. v. Gerace*,
  755 F.2d 993 (2d Cir. 1985)...................................................................................... 20

*Isaacson v. Dow Chem. Co.*,
  517 F.3d 129 (2d Cir. 2008)...................................................................................... 19

*Jefferson Cnty. Ala. v. Acker*,
  527 U.S. 423 (1999) ...................................................................................................... 13

# TABLE OF AUTHORITIES

(continued)

Page(s)

CASES (CONT.)

*Latiolais v. Huntington Ingalls, Inc.*,
   951 F.3d 286 (5th Cir. 2020) (en banc) ........................................ 2, 13, 18

*Maryland v. Soper (No. 1)*,
   270 U.S. 9 (1926) ...................................................................... 16

*McMahon v. Presidential Airways, Inc.*,
   410 F. Supp. 2d 1189 (M.D. Fla. 2006) ........................................ 25

*Nat'l Meat Ass'n v. Harris*,
   565 U.S. 452 (2012) ............................................................... 20, 22

*Papp v. Fore-Kast Sales Co.*,
   842 F.3d 805 (3d Cir. 2016) ....................................................... 18

*Rancho Viejo, LLC v. Norton*,
   323 F.3d 1062 (D.C. Cir. 2003) .................................................. 23

*Riegel v. Medtronic, Inc.*,
   552 U.S. 312 (2008) ................................................................. 22

*Savage v. Jones*,
   225 U.S. 501 (1912) ................................................................. 23

*Sawyer v. Foster Wheeler LLC*,
   860 F.3d 249 (4th Cir. 2017) ..................................................... 18

*Scrogin v. Rolls-Royce Corp.*,
   No. 3:10cv442 (WWE), 2010 WL 3547706 (D. Conn. Aug. 16, 2010)................... 25

*St. Charles Surgical Hosp., L.L.C. v. La. Health Serv. & Indem. Co.*,
   935 F.3d 352 (5th Cir. 2019) ..................................................... 15

*United States v. Todd*,
   245 F.3d 691 (8th Cir. 2001) ..................................................... 23

*Watson v. Philip Morris Cos.*,
   551 U.S. 142 (2007) ............................................................. 15, 16

*Wazelle v. Tyson Foods, Inc.*,
   No. 2:20-CV-203-Z, 2021 WL 2637335 (N.D. Tex. June 25, 2021) ...............passim

# TABLE OF AUTHORITIES
(continued)

Page(s)

CASES (CONT.)

*Winters v. Diamond Shamrock Chem. Co.*,
    149 F.3d 387 (5th Cir. 1998) ................................................................. 15

*Wullschleger v. Royal Canin U.S.A., Inc.*,
    953 F.3d 519 (8th Cir. 2020) ................................................................. 24


STATUTES

21 U.S.C. § 456(a) ............................................................................... 21

21 U.S.C. § 467e.......................................................................... 20, 21, 22

21 U.S.C. § 608...................................................................................... 21

21 U.S.C. § 678.......................................................................... 20, 21, 22

28 U.S.C. § 1442(a)(1) ......................................................................... 13

42 U.S.C. § 5195a(b) ............................................................................ 6

50 U.S.C. § 4501 *et seq.*....................................................................... 6

50 U.S.C. § 4502(a)(4) ......................................................................... 22

50 U.S.C. § 4511(a) .............................................................................. 23

50 U.S.C. § 4511(b) .............................................................................. 6


OTHER AUTHORITIES

9 C.F.R. § 381.36(f)(1)(vi).................................................................... 21

9 C.F.R. § 416.2(b)................................................................................ 21

9 C.F.R. § 416.5(b)................................................................................ 21

9 C.F.R. § 416.5(c)................................................................................ 20

85 Fed. Reg. 15,337 (Mar. 13, 2020).................................................. 6

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**OTHER AUTHORITIES (CONT.)**

85 Fed. Reg. 26,313 (Apr. 28, 2020) ........................................................................ 4, 11

# INTRODUCTION

The primary issue presented here—whether Tyson was acting at the direction of federal officers for purposes of federal court jurisdiction—has already been resolved by two Texas district courts. In cases involving materially identical issues and arguments, both the Eastern and Northern Districts of Texas recently denied motions for remand and issued detailed orders concluding that Tyson's removal under the federal officer removal statute was proper. *See Wazelle v. Tyson Foods, Inc.*, No. 2:20-CV-203-Z, 2021 WL 2637335 (N.D. Tex. June 25, 2021); *Fields v. Brown*, No. 6:20-cv-00475, 2021 WL 510620 (E.D. Tex. Feb. 11, 2021). The Fifth Circuit subsequently denied a request for interlocutory appeal of that ruling in *Fields*.

As the *Wazelle* and *Fields* courts recognized, federal court is the proper forum for this case because Tyson was "acting under the direction of multiple federal agencies" as part of the federal "critical-infrastructure designation" "since [the declaration of a national emergency on] March 13, 2020," *Fields*, 2021 WL 510620, at *3 & n.1, and Tyson "exhibited 'an effort to help assist, or carry out, the duties and tasks of the federal superior.'" *Wazelle*, 2021 WL 2637335, at *4 (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 152 (2007)). Indeed, Tyson worked "hand-in-hand" with federal officials from the time of the declaration of a national emergency to safely continue operations to secure the national food supply. Plaintiffs assert that Tyson should have operated the facilities differently or shut them down entirely, but those allegations directly conflict with Tyson's working at the direction of the U.S. government to continue operations. Removal was proper for the following reasons.

**First,** Plaintiffs do not appear to dispute that a presidential directive under the Defense Production Act permits federal officer removal. Instead, Plaintiffs' primary argument is one of timing—that Mr. Chavez contracted COVID-19 and Mr. Cowan "was exposed to COVID-19" before the April 28, 2020 presidential order and resulting agency directives. However, this narrow reading of the federal officer removal statute was rejected by two courts in this Circuit in *Wazelle* and *Fields*. As

those courts emphasized, Tyson's actions at the behest of federal officers began long before the April 28 order, *see Fields*, 2021 WL 510620, at *3 & n.1; *Wazelle*, 2021 WL 2637335, at *3-5 & n.3, which was merely another step in a long line of federal efforts to maintain critical infrastructure and specifically the nation's food supply.

**Second,** to the extent Plaintiffs argue that their claims must arise directly from federal orders or under federal law to be removable, Plaintiffs are not following the correct standards. After statutory amendments in 2011, this case is removable so long as Plaintiffs' claims are merely "connected" or "associated" with federal directions. *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc). They plainly are, as Plaintiffs assert both that Tyson should have followed different standards than the federal directions and that Tyson failed to comply with the federal directions. And, "[l]ogically, the choice of what safety precautions should be taken—such as whether personal protective equipment should be provided or what social-distancing measures should be adopted—is connected to the broader decision to keep the plant operating during the pandemic." *Wazelle*, 2021 WL 2637335, at *5. Moreover, the well-pleaded complaint rule does not apply to federal officer removal, and a federal defense suffices to establish a federal jurisdictional nexus. In terms of the applicable standard, Tyson need only present allegations demonstrating a plausible application of 28 U.S.C. § 1442, and its federal defense need only be colorable. *See Betzner v. Boeing Co.*, 910 F.3d 1010, 1014-15 (7th Cir. 2018). At the very least, Tyson's federal defenses under the FMIA and PPIA are plausible, and that is all that is required. *See Wazelle*, 2021 WL 2637335, at *2-3; *Fields*, 2021 WL 510620, at *5.

**Finally,** this Court also has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims, although pleaded in terms of state law, necessarily raise substantial and disputed issues of federal law. Plaintiffs' complaint implicates the Executive Branch's decisions on an issue of decidedly federal concern: how to secure the food supply during a nationwide pandemic, unprecedented for at least a century, while also protecting the workers whose dedicated efforts are necessary to

2

produce that food supply. Those issues should be resolved by the federal courts.

## BACKGROUND

### A.     The Complaint and motion to remand

Plaintiffs allege negligence, fraudulent misrepresentation, intentional misrepresentation, premises liability, wrongful death, and a survival claim in connection with the deaths of their relatives, Mr. Chavez and Mr. Cowan, "after becoming infected with COVID-19." [Dkt. 1, Ex. B ("Compl.") ¶ 58] Plaintiffs make the conclusory allegation that Mr. Chavez and Mr. Cowan "contracted COVID-19 because of the unsafe working conditions at" Tyson's facilities in Center and Sherman, Texas (*id.* ¶¶ 4, 6), but plead no additional facts as to when or how they contracted COVID-19 or to rule out contraction from another community source. Instead, Plaintiffs vaguely allege that Tyson (along with three other named Defendants) "failed to protect Tyson Food[s] employees from the known dangers associated with the coronavirus," including by allegedly failing to implement various measures. [*Id.* ¶¶ 17, 23, 30, 42(a)-(qq), 74(a)-(l)] Plaintiffs specifically allege that one of these failures was Tyson's decision to "ke[ep] [its] facilities open" despite the dangers associated with the pandemic. [*Id.* ¶¶ 29, 30(e), 42(f)-(g), (p), (q)] Again, Plaintiffs do not allege any specific incident or event that led to Mr. Chavez's or Mr. Cowan's illnesses.

In moving to remand, Plaintiffs fail to adequately address the fact that federal officials designated the Tyson facilities at issue as "critical infrastructure," and that from the very beginning of a federal response to the pandemic Tyson worked at the specific and continuous direction of the President, Vice President, and the U.S. Departments of Homeland Security, Agriculture, and Transportation to safely continue operations to secure the food supply as part of the nation's "critical infrastructure."

Instead, Plaintiffs attempt to minimize the repeated and significant directions Tyson received from federal officers by focusing on just three federal pronouncements referenced in Tyson's notice of removal, including the President's Executive Order of April 28, 2020. *See* Exec. Office of Pres., *Executive Order on Delegating Authority*

3

*Under the Defense Production Act with Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19* ("Food Supply Chain Resources"), 85 Fed. Reg. 26,313 (Apr. 28, 2020). That order directed the Secretary of Agriculture "to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA." *Id.* And the President specifically underscored that "[i]t is important that processors of beef, pork, and poultry . . . in the food supply chain continue operating and fulfilling orders to ensure a continued supply of protein for Americans." *Id.*

Plaintiffs seem to tacitly accept that following that order and the resulting directives would be a proper basis for federal officer removal. Rather, they argue that the order "did not issue until after" Mr. Chavez had passed away and Mr. Cowan allegedly had been "exposed to COVID-19," and therefore cannot serve as a basis for removal. [Dkt. 17 ("Mot.") at 8, 17, 20] But the post-April 28 directives were just some of many federal directives under which Tyson had been operating its facilities since March 13.

Plaintiffs also acknowledge the President's March 13 national disaster declaration and March 16 *Coronavirus Guidelines* in isolation, but at no point in their motion do Plaintiffs grapple with the fact that the Tyson facilities at issue were enlisted by federal officials—up to and including the President—to assist the federal government in ensuring the nation's food supply remained secure during the throes of the greatest national health crisis in a century.

### B. Federal "critical infrastructure" designation and collaboration with federal officers to continue operations.

Tyson provides more than 20% of the nation's supply of meat and poultry—enough to feed 60 million Americans every day. Tyson employs more than 120,000 workers at processing facilities.

**Critical infrastructure.** After the events of 9/11, the federal government devoted significant resources to the mission of protecting the nation's "critical

infrastructure." The Critical Infrastructure Protection Act defined "critical infrastructure" at 42 U.S.C. § 5195c(e), and upon the creation of the Department of Homeland Security in 2002, that new department has headed federal planning for protection and resilience of "critical infrastructure" against national threats and disasters. [Declaration of Barbara Masters ("Masters Decl.") ¶ 8 & Attachment C] Of particular significance here is Presidential Policy Directive 21, issued by President Obama on February 12, 2013.[1] Its purpose was to "advance[] a national unity of effort to strengthen and maintain secure, functioning, and resilient critical infrastructure."[2]

There are 16 "sectors" of the national defense and economy "whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or destruction would have a debilitating effect on security, national economic security, national public health or safety, or any combination thereof."[3] All components of the Food and Agriculture Sector are considered critical infrastructure. The federal government uses the graphic below to represent them:



---

[1] https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/presidential-policy-directive-critical-infrastructure-security-and-resil

[2] *Id.*

[3] https://www.cisa.gov/critical-infrastructure-sectors

[Masters Decl. ¶ 8 & Attachment D]

Coordinating protection of the Food and Agricultural Sector has been assigned to the Departments of Agriculture and Health and Human Services, which have an extensive critical infrastructure plan for the Sector.[4] The mission of that plan is "to protect against a disruption anywhere in the food system that would pose a serious threat to public health, safety, welfare, or to the national economy."[5]

**The Defense Production Act.** The federal government possesses additional relevant authority under the Defense Production Act ("DPA"), 50 U.S.C. § 4501 *et seq.* Under the DPA, the President has power to "control the general distribution of any material in the civilian market" that the President deems "a scarce and critical material essential to the national defense." *Id.* § 4511(b). The Critical Infrastructure Protection Act cross-references the DPA and characterizes the emergency preparedness activities that both statutes contemplate as part of the "national defense." *See* 42 U.S.C. § 5195a(b). The statutes vest the President with ample authority to direct the operation of critical infrastructure to protect the national food supply—a point the President underscored shortly after declaring a national emergency. *See Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing*, The White House (Mar. 18, 2020), https://bit.ly/2Nh91XZ ("We'll be invoking the Defense Production Act, just in case we need it.").

**President declares national emergency.** On March 13, 2020, the President declared that "the COVID-19 outbreak in the United States constitutes a national emergency, beginning March 1, 2020." Exec. Office of Pres., *Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, 85 Fed. Reg. 15,337, 15,337 (Mar. 13, 2020). At the time of that declaration—the first time in history that all 50 states have been subject to disaster orders at one time—Tyson was in

---

[4] https://www.cisa.gov/sites/default/files/publications/nipp-ssp-food-ag-2015-508.pdf

[5] *Id.* at 13.

close contact with officials at the U.S. Departments of Homeland Security and Agriculture regarding continued operations. It may be recalled that in the early stages of the pandemic in the U.S., consumers nationwide began to stockpile food supplies, leading to empty grocery store shelves, and media coverage prompting further stockpiling, threatening to create a vicious cycle endangering the nation's food supply. On March 15, 2020, the President personally met with Tyson and other food industry executives to discuss the national imperative of securing the stability of the supply chain. The President provided the following statement regarding the "hand-in-hand" cooperation with the federal government to keep supply chains operating:

> "All of them are working hand-in-hand with the federal government as well as the state and local leaders to ensure food and essentials are constantly available," President Trump said. "We had a long conversation with them and they're going to work 24 hours around the clock, keeping their store stocked."[6]

**Hand-in-hand collaboration.** As an example of that "hand-in-hand" collaboration the President cited, Tyson communicated directly with the Deputy Assistant Director for the National Risk Management Center regarding "critical infrastructure" designations for particular functions and employees—such as trucking and other services necessary to continue operations. [Masters Decl. ¶¶ 7, 11 & Attachments A & B] For example, on March 13, as part of the coordination of "critical infrastructure" designations and response to the pandemic, the Department of Transportation approved special status for workers providing transportation to support the "emergency restocking of stores." [Masters Decl. ¶ 12]

The U.S. Department of Homeland Security relied upon its "National Critical Functions Set" to designate "Produce and Provide Agricultural Products and Services" and "Produce and Provide Human and Animal Food Products and Services" as critical "supply" functions. [*Id.* ¶ 13 & Attachment D] Those designations flowed down

---

[6] https://www.foodbusinessnews.net/articles/15621-trump-meets-with-food-company-leaders

to individual employees who received letters authorizing them to continue working and traveling in support of "critical infrastructure" despite any state or local quarantine restrictions. They were instructed to keep the letters on them at all times and be prepared to show them to officials. [*Id.*] Tyson also communicated regularly with U.S. Department of Agriculture officials, such as Paul Kiecker, FSIS Administrator, and FSIS employees were on-site at meat and poultry processing facilities. [*Id.* ¶¶ 16-17]

**White House Guidelines.** On March 16, the White House issued *Coronavirus Guidelines for America*, which confirmed the obligation of Tyson and other food producers to aid the federal government in preventing a food shortage, stating: employees in "critical infrastructure industr[ies]" have a "special responsibility." Exec. Office of Pres., *The President's Coronavirus Guidelines for America*, Mar. 16, 2020, at 2. [Masters Decl. ¶ 15 & Attachment G] In their continued operations, critical employers and workers "should follow CDC guidance to protect [their] health at work." [*Id.*]

On the same day, the U.S. Department of Agriculture issued a statement that it was committed to the "timely delivery of services to maintain the movement of America's food supply from farm to fork," and that it was "prepared to utilize their authority and all administrative means and flexibilities to address staffing considerations." [*Id.* ¶ 17 & Attachments H & I] The Department explained:

> We have all seen how consumers have reacted to the evolving coronavirus situation and how important access to food is to a sense of safety and wellbeing. It is more important than ever that we assure the American public that government and industry will take all steps necessary to ensure continued access to safe and wholesome USDA inspected products.

[*Id.*] The Department emphasized that accomplishing these federal imperatives would require "working closely with industry to fulfill our mission of ensuring the safety of the U.S. food supply," and that "early and frequent communication" between government and industry would be "key." [*Id.*]

Consistent with those directives and assurances, numerous federal agencies

8

immediately began coordinating with Tyson to ensure its continued operation in carrying out the government's mission of ensuring that the national food supply chain would remain intact. For example, on March 13, 2020—the same day the President declared a national emergency—CISA held a conference call with Tyson and others to coordinate procuring and delivering critical supplies, such as personal protective equipment, to food companies to enable them to continue to operate during the national emergency. [*Id.* ¶ 7] The Department of Agriculture and Federal Emergency Management Agency received and responded to personal protective equipment and other critical supply requests so that Tyson could keep operating as directed. [*Id.* ¶ 14 & Attachments E & F] And Tyson continued to frequently communicate and coordinate with federal officials from CISA, its National Risk Management Center ("NRMC"), and in particular with FSIS, regarding the best way to safely continue operations. [*Id.* ¶¶ 7, 16]

Federal officials reiterated the need for continued operations supported by the agencies themselves. Assistant Administrator Bronstein issued guidance on March 20 that emphasized that the USDA "seeks a united effort with our industry partners in preventing the spread of COVID-19 while continuing to produce safe food for consumers." [*Id.* ¶ 17 & Attachment I] Shortly thereafter, Congress allocated additional funding to FSIS to help maintain FSIS presence at facilities so that operations could continue despite the unique and additional oversight responsibilities presented by the pandemic. An FSIS notice to industry on April 3 explained that "FSIS has received additional funding for increased expenditures associated with executing the FSIS mission during the pandemic." [*Id.* ¶ 18 & Attachment J]

While the federal government had more pressing priorities in the early days of the pandemic than formalizing the obligation of meat and poultry processing facilities to continue to operate, on April 7, the Vice President underscored that the obligation was a matter of federal necessity, not private choice, in public remarks on behalf of the Coronavirus Task Force that he led. Vice President Pence thanked food industry

workers for their service to the United States, emphasized the critical federal inter-
ests at issue, and implored everyone to keep working to stay open:

> And so, on behalf of the President, on behalf of our entire
> team, and on behalf of a grateful nation, let me just say to
> all of you that are working in the food industry at every
> level across the country: Just understand that you are vi-
> tal. You are giving a great service to the people of the
> United States of America. **And we need you to continue,
> as a part of what we call our critical infrastructure, to
> show up and do your job and know that we're going to
> continue to work tirelessly in working with all of your
> companies to make sure that that workplace is safe**.[7]

The President also underscored that the heroic efforts to keep the food supply
chain functioning were not optional. He openly declared: "The Defense Production Act
is in full force, but haven't had to use it because no one has said NO!" Doina Chiacu,
*Trump Administration Unclear over Emergency Production Measure to Combat Coro-
navirus* ("*Emergency Production*"), Reuters (March 24, 2020), http://reut.rs/3rS3MN5.

But notwithstanding the close collaboration between Tyson and federal offi-
cials and the clear federal mandate to continue operations, state and local officials
began asserting contradictory authority with respect to meat and poultry processing
facilities. [Masters Decl. ¶ 20] Those state and local actions led to an Executive Order
re-emphasizing federal supremacy with respect to those facilities and their opera-
tions and the critical need for consistent, uniform rules. [*Id.* & Attachment K]

### C.   The April 28 Executive Order invoking the Defense Production Act.

The President issued an Executive Order on April 28, specifically citing that
"recent actions in some States have led to the complete closure of some large pro-
cessing facilities. Such actions may differ from or be inconsistent with interim guid-
ance recently issued by the Centers for Disease Control and Prevention (CDC) of the
Department of Health and Human Services and the Occupational Safety and Health

---

[7] *Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task
Force in Press Briefing*, The White House (Apr. 7, 2020), https://bit.ly/3pcdiZP (emphasis added).

Administration (OSHA) of the Department of Labor." *See* Food Supply Chain Resources, 85 Fed. Reg. at 26,313. In response to those non-federal actions, the President expressly invoked his authority under the DPA to ensure the continued national meat and poultry supply, and directed the Secretary of Agriculture "to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA." *Id.* The President emphasized that "[i]t is important that processors of beef, pork, and poultry . . . in the food supply chain continue operating and fulfilling orders to ensure a continued supply of protein for Americans." *Id.*

The same day, the Secretary of Agriculture announced that his Department would "work with meat processing to affirm they will operate in accordance with the CDC and OSHA guidance" and "ensure that facilities implementing this guidance to keep employees safe can continue operating." U.S. Dep't of Agric., *USDA to Implement President Trump's Executive Order on Meat and Poultry Processors*, Apr. 28, 2020.[8] Reiterating that "[o]ur nation's meat and poultry processing facilities play an integral role in the continuity of our food supply chain," the Secretary made clear that their continued operation was not just permissible, but a national imperative. *Id.*

The following week, acting under the executive order, the Secretary of Agriculture issued a letter instructing meat-processing plants to either remain open or submit written plans to reopen. Letter from Sonny Perdue, Sec'y of Agric., *Re: Executive Order 13917 Delegating Authority Under the Defense Production Act with Respect to the Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19* (May 5, 2020). That letter reiterated that meat and poultry producers played "an integral role in the continuity of our food supply chain," and instructed them "[e]ffective immediately" to "utilize the guidance issued . . . by the CDC and OSHA specific to the meat and poultry processing industry" to "safeguard[] the

---

[8] https://www.usda.gov/media/press-releases/2020/04/28/usda-implement-president-trumps-executive-order-meat-and-poultry

health of the workers and the community while staying operational or resuming operations." *Id.* Meat and poultry processing plants that had been closed due to the COVID-19 pandemic, the Secretary instructed, "should resume operations as soon as they are able after implementing the CDC/OSHA guidance for the protection of workers." *Id.*

The CDC and OSHA continually updated their guidance as new information about the disease came to light. *See* CDC, *Meat and Poultry Processing Workers and Employers: Interim Guidance from CDC and the Occupational Safety and Health Administration (OSHA)* (updated June 11, 2021).[9] But the message from the President and other federal officials in the early months of the pandemic remained clear and unchanged from the outset: Meat and poultry processors should continue to operate subject to applicable federal guidance from the CDC and OSHA.

## ARGUMENT

## I.   This Court has jurisdiction under the federal officer removal statute.

This Court—like the courts in *Fields* and *Wazelle*—has jurisdiction under 28 U.S.C. § 1442(a)(1) because the complaint challenges Tyson's actions "under the color of federal authority" to "maintain[] operations during the pandemic to ensure the stability of the national food supply." *Wazelle*, 2021 WL 2637335, at *5; *see also Fields*, 2021 WL 510620, at *3. The statute provides that a civil action may be removed to federal court if the action is asserted against a person acting under the direction of a federal officer:

> A civil action . . . that is against or directed to any of the following may be removed . . . . :
>
> (1) The United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . . .

---

[9] https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat-poultry-processing-workers-employers.html

28 U.S.C. § 1442(a)(1) (emphasis added). Tyson properly removed this case to federal court under § 1442(a)(1) because (1) Tyson "acted pursuant to a federal officer's directions," (2) "the charged conduct is connected or associated with an act pursuant to a federal officer's directions," (3) Tyson has "asserted a colorable federal defense," and (4) Tyson "is a 'person' within the meaning of the statute." *Latiolais*, 951 F.3d at 296.

### A.   Tyson acted under the direction of federal officers.

"When a national emergency was declared in response to the COVID-19 pandemic on March 13, 2020, Tyson Foods, along with other components of the Food and Agriculture Sector, was designated as critical infrastructure." *Fields*, 2021 WL 510620, at *2. From that point forward, Tyson "interacted," "collaborat[ed]," and "work[ed] directly with" federal officials to help the U.S. government fulfill its responsibility of "guarantee[ing] that there was an adequate food supply." *Id.* at *2-3. "Accordingly, . . . [Tyson was] 'acting under' the directions of federal officials" from the time of the national emergency declaration. *Wazelle*, 2021 WL 2637335, at *5.

To avoid these clear federal directives and the weight of authority in this Circuit, Plaintiffs rely heavily on a Northern District of Iowa order that was stayed by the Eighth Circuit and is currently subject to interlocutory appeal, and Plaintiffs myopically focus on three examples of federal direction cited in Tyson's notice of removal. These arguments fail. Importantly, for removal to be proper, Tyson need only show under "federal pleading standards" that it is "plausible" that it was acting under the direction of federal officers, *see Betzner*, 910 F.3d at 1014-15, and a defendant is not required to virtually "win his case before he can have it removed," *Jefferson Cnty. Ala. v. Acker*, 527 U.S. 423, 431 (1999) (citation omitted).

**Plaintiffs rely on a stayed out-of-Circuit order rather than recent orders out of this Circuit.** As explained above, multiple Texas federal courts, including a Court within this District, have already resolved the precise issues presented in Plaintiffs' motion for remand. Applying Supreme Court and Fifth Circuit precedent, those courts held that Tyson readily satisfied the "acting under" prong because

13

Tyson "exhibited 'an effort to help assist, or carry out, the duties and tasks of the federal superior' . . . by working directly with the Department of Agriculture and the FSIS to guarantee that there was an adequate food supply" from the outset of the pandemic. *Fields*, 2021 WL 510620, at *3 (quoting *Watson*, 551 U.S. at 152); *Wazelle*, 2021 WL 2637335, at *4 (same).

Plaintiffs' reliance on *Fernandez v. Tyson Foods, Inc.*, No. 20-CV-2079-LRR, 2020 WL 7867551 (N.D. Iowa Dec. 28, 2020)—an out-of-Circuit district court ruling—is misplaced. To begin, the district court's order in *Fernandez* was promptly stayed by the Eighth Circuit pending Tyson's interlocutory appeal, and thus the order is not currently in effect. Moreover, as explained in Tyson's briefing in the Eighth Circuit, the *Fernandez* order erred by failing to acknowledge that Tyson was acting at the express direction of federal officers from the time the President declared the pandemic a national emergency—well before the April 28 Executive Order that the plaintiffs in those cases, and here, ask the Court to incorrectly consider in isolation. The Iowa court also did not have the benefit of binding Eighth Circuit guidance—like the Fifth Circuit's en banc opinion in *Latiolais*—regarding the broadening of the federal officer removal statute effected by the 2011 amendments.

**Plaintiffs ignore the numerous and extensive federal directives under which Tyson was operating.** Plaintiffs also attempt to downplay the critical-infrastructure designation by labeling it "vague" and misconstruing Tyson's notice of removal as relying on just three federal directions. [*See* Mot. at 6-14] But Tyson is not relying solely on those three directives or solely on the critical-infrastructure designation. Tyson operated its facilities—including in Center and Sherman—"under the direction of multiple federal agencies since March 13, 2020," *Fields*, 2021 WL 510620, at *3, as evidenced by the frequent communication, detailed supervision, and repeated directives from federal officers to Tyson, described above, in the attached declaration and exhibits, and in *Wazelle* and *Fields*.

Indeed, even Plaintiffs' attacks on the federal directives they do address miss

the mark. Plaintiffs cannot seriously dispute that compliance with the April 28 Executive Order would permit federal officer removal. What they attempt to argue is that somehow actions taken before that Order were not acting under the direction of a federal officer, and the Order fails to qualify as federal direction because it purportedly did not contain "detailed and direct orders." [Mot. at 7-8] Both arguments fail.

Here, Tyson was designated as "critical infrastructure" under emergency plans growing out of Presidential Policy Directive 21, which were invoked upon declaration of a national emergency. But the direction to Tyson went far beyond this initial designation. Tyson received direction from federal officers at the highest levels—the President and Vice President. And Tyson was in constant contact with federal officials at the Department of Homeland Security and the USDA regarding continued operations, including the facilitation of USDA's own FSIS employees at Tyson's facilities and the provision of additional funding and supplies so that Tyson could continue operating. The purpose of those actions—and the many others described in the Declaration of Barbara Masters—was to secure the food supply during a national emergency at the direction of federal officers. Those actions more than plausibly satisfy the standard for federal officer removal.

In the parlance of the Supreme Court's most recent case discussing federal officer removal, Tyson's actions were not "simply *complying* with the law." *Watson*, 551 U.S. at 152; *see also* Mot. at 12. Rather, Tyson was working hand-in-hand with federal officers to "produce an item that [the government] needs" for the national defense. *Watson*, 551 U.S. at 153. It is well established that private providers to the government of military products (*see, e.g.*, *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398-400 (5th Cir. 1998)) or health benefits (*see, e.g.*, *St. Charles Surgical Hosp., L.L.C. v. La. Health Serv. & Indem. Co.*, 935 F.3d 352, 355-56 (5th Cir. 2019)) can invoke federal officer removal. Here, Tyson was acting at the direction of federal officers in a time of emergency to provide the food security the government desired.

While the April 28 order was certainly a clear, formal order from the President,

Plaintiffs cannot dispute—and do not dispute—that federal officers designated Tyson and its employees as "critical infrastructure," and the whole point of that designation is to continue operations during an emergency, working with the Department of Homeland Security and USDA, the designated leader with respect to the Food and Agricultural Sector of "critical infrastructure." To that end, the "critical infrastructure" designation flowed down to individual employees and suppliers in the food-supply industry who were given letters specifically directing them to keep them in their possession at all times and present them to authorities if they were otherwise subject to lockdown or quarantine orders. [Masters Decl. ¶¶ 12-13 & Attachment D] And the federal government itself dedicated employees of the FSIS, and Congress allocated additional funding, precisely for the purpose of continued operations under federal oversight. [*Id.* ¶¶ 16-18]

As to Plaintiffs' suggestion (at 8-9) that a formal directive under the DPA is required to satisfy the "acting under" requirement, the *Wazelle* Court put it best:

> To the extent some of the federal direction may have been more "informal," including emails, phone calls, and weekly meetings with FSIS and other federal officials regarding how to maintain operations safely, that informality does not change the fact that Defendants were still receiving and following federal direction. "It was recognized that, for reasons of practical necessity, urgently needed government orders had to be obtained "'by non-mandatory directions based ultimately on the powers of compulsion rather than by the actual exercise of the statutory compulsive powers.'" *E. Air Lines, Inc. v. McDonnel Douglas Corp.*, 532 F.29 957, 993 (5th Cir. 1976) (quoting Dodd, *Impossibility of Performance of Contracts Due to War-Time Regulations*, 32 HARV. L. REV. 789, 798 (1919)). Although the President did not invoke the Defense Production Act until April 28, 2020, the President's authority under the DPA and Tyson Foods' earlier designation as critical infrastructure gave greater weight to the informal communications during the early and rapidly developing days of the COVID-19 pandemic. *Id.* at 998.

*Wazelle*, 2021 WL 2637335, at *4 n.3. Indeed, if federal agents direct a private person to drive a car in pursuit of bootleggers, that qualifies for federal officer removal. *See Watson*, 551 U.S. at 149-50 (discussing *Maryland v. Soper (No. 1)*, 270 U.S. 9 (1926)).

16

Or if a federal contracting officer tells a contractor to stop work or hold an invoice, that likewise qualifies. *See CRGT, Inc. v. Northrop Grumman Sys. Corp.*, Civ. A. No. 1:12-cv-554, 2012 WL 3776369, at *2 (E.D. Va. Aug. 28, 2012). With respect to the DPA in particular, the President's "broad authority" under that statute can be exercised through either "formal, published regulations" or "informal and indirect methods of securing compliance." *E. Air Lines*, 532 F.2d at 992-93. That case famously held that federal officials invoked their authority with a defense contractor through "jawboning" as opposed to formal orders like the April 28 order here. *See id.* at 992-95.

Any supposed "informality" to federal instructions is especially irrelevant here, given the shadow of the President's authority under the DPA. The President made that specific point on March 24 with respect to the provision of masks: "The Defense Production Act is in full force, but haven't had to use it because no one has said NO!"[10] The Fifth Circuit has recognized that such dynamics still amount to government orders and actions, that "the threat of mandatory powers would be used as a 'big stick' to induce voluntary cooperation." *E. Air Lines*, 532 F.2d at 998. And that is especially appropriate in a time of emergency, as "a cumbersome and inflexible administrative process is antithetical to the pressing necessities." *Id.* And eventually the President did formally invoke the Defense Production Act to confirm the supremacy of federal directions to meat and poultry companies during this national emergency.

## B.   There is a sufficient nexus between Tyson's actions and federal directions.

Because "Tyson Foods acted under the color of federal authority by maintaining operations during the pandemic to ensure the stability of the national food supply" and Plaintiffs' complaint "allege[s] that [Tyson] failed to create an adequately safe working environment during the COVID-19 pandemic," the "final prong of the *Latiolais* standard is met" here. *Wazelle*, 2021 WL 2637335, at *5; *see also Fields*,

---

[10] Chiacu, *Emergency Production*.

2021 WL 510620, at *4.

Relying on *Winters*, Plaintiffs argue that, to establish a causal nexus, Tyson must show that federal officers imposed "detailed specifications concerning the make-up, packaging, and delivery of" a product, "compulsion to provide the product to the government's specifications, and . . . ongoing supervision the government exercised over the formulation, packaging, and delivery of" the product. [Mot. at 16 (quoting *Winters*, 149 F.3d at 400)] As an initial matter, *Winters* applied the standard from before the 2011 statutory amendments. *See Wazelle*, 2021 WL 2637335, at *5 ("The *Winters* standard [requiring a direct causal nexus] no longer governs."). Those amendments made "removable to federal court '[a] civil action . . . that is against or directed to . . . any person acting under [a federal] officer . . . *for or relating to* any act under color of such office.'" *Latiolais*, 951 F.3d at 292 (alterations in original) (emphasis added) (quoting 28 U.S.C. § 1442(a)). The federal officer removal statute no longer imposes a "direct causal nexus" requirement. *Id.* By "plainly express[ing] that a civil action *relating to* an act under color of federal office may be removed," Congress "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Id.*

Thus, Tyson must demonstrate only that Plaintiffs' claims are "connected or associated with an act under color of federal office." *Id.* at 296; *see also Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (same); *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016) (same).

Plaintiffs' claims easily satisfy the "minimal 'causal connection'" requirement. *Latiolais*, 951 F.3d at 295 (quoting *Willingham v. Morgan,* 395 U.S. 402, 409 (1969), and *Jefferson Cnty.*, 527 U.S. at 432-33). Plaintiffs allege that Messrs. Chavez and Cowan contracted COVID-19 because Tyson (a) continued operations despite a Texas stay-at-home order and (b) failed to keep the workplace safe by taking measures compliant with, or above and beyond, federal directions. [Mot. at 2; *see also* Compl. ¶¶ 27(j)-(n), 30(a)-(h), 42(a)-(qq)] Those allegations are obviously connected to the

18

federal direction to (a) continue operations and (b) do so in compliance with CDC and OSHA guidelines. Tyson's operation under federal direction is therefore directly related to Plaintiffs' workplace injury claims. Stated differently, the "purported act under color of federal authority is the decision to maintain operations despite the pandemic," and "[n]aturally, the choice of what safety precautions should be taken . . . connects to the broader decision to keep the plant open during the pandemic in the first place." *Fields*, 2021 WL 510620, at *4; *see also Wazelle*, 2021 WL 2637335, at *5.

The cases Plaintiffs rely on regarding specific products are inapposite. [*See* Mot. 6-7, 15-16] The federal directives here were not about the product—unlike the military contractor cases. Here, they were about continued operation, under detailed directives regarding safety measures, in order to supply food during the national crisis. These are the very actions Plaintiffs allege caused their injuries.

Finally, Plaintiffs argue that their claims are not connected to federal directives because the claims arise out of Tyson's alleged conduct that was impermissible under the federal directives. [*See* Mot. at 16] But any dispute about Tyson's compliance with, or the scope of Tyson's authority to implement, the federal directives "is one for the federal—not state—courts to answer." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008) (federal courts must resolve "whether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government") (citing *Willingham*, 395 U.S. at 409).

### C.    Tyson has colorable federal defenses.

Tyson has averred "colorable federal defense[s]" to Plaintiffs' claims, *Bell v. Thornburg*, 743 F.3d 84, 89 (5th Cir. 2014), under the FMIA and PPIA's express preemption provisions, *see Wazelle*, 2021 WL 2637335, at *2-3; *Fields*, 2021 WL 510620, at *4-5, and conflict preemption based on the Executive Branch's directives.

**Federal Meat Inspection Act and Poultry Products Inspection Act.** The FMIA and PPIA expressly preempt any attempt by the states to impose regulations that are "in addition to, or different than" those prescribed under the Acts:

> Requirements within the scope of this [Act] with respect to premises, facilities and operations of any establishment at which inspection is provided under subchapter I of this chapter, which are in addition to, or different than those made under [the Act] may not be imposed by any State . . . .

21 U.S.C. § 678; *see also id.* § 467e. These provisions "sweep[] widely" and "prevent[] a State from imposing any additional or different—even if non-conflicting—requirements that fall within the scope of the Act[s] and concern a slaughterhouse's facilities or operations." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459-60 (2012) (FMIA); *see also Grocery Mfrs. of Am., Inc. v. Gerace*, 755 F.2d 993, 997 (2d Cir. 1985) (FMIA and PPIA preemption clauses are "substantially identical").

Significantly, whether a requirement falls "within the scope of" the Acts does not depend on whether the Department of Agriculture has adopted or rejected the requirement. That is "irrelevant," "because the FMIA's preemption clause covers not just conflicting but also different or additional state requirements." *Harris*, 565 U.S. at 461. The question is whether the Department *could have adopted* the requirement: If the Department "could issue regulations under the FMIA . . . mandating" the requirement at issue, then the state's requirement is preempted. *Id.* at 466.

There is no question that the Department "could issue regulations" addressing infectious diseases in meat processing facilities. It already has. FSIS has promulgated hundreds of pages of federal regulations addressing meat-processing facilities and operations, including infectious disease control. For example, FSIS has promulgated:

- **A "disease control" regulation** providing that "[a]ny person who has or appears to have an infectious disease . . . must be excluded from any operations which could result in product adulteration and the creation of insanitary conditions until the condition is corrected." 9 C.F.R. § 416.5(c).

- **Personal protective equipment regulations** requiring "[a]prons, frocks, and other outer clothing worn by persons who handle product," and detailed sanitation and hygiene regulations for things

20

such as "[h]and rinsing facilities" and "clean[ing] and sanitiz[ing]" surfaces in the facility. *Id.* §§ 381.36(f)(1)(vi), 416.2(b), 416.5(b).

Plaintiffs allege that Tyson failed to implement various measures that they allege would have provided protection to employees. [*E.g.*, Compl. ¶¶ 30, 42] Tyson vigorously disputes those allegations; it implemented extensive protective measures. But for purposes of removal, the crucial, dispositive point is this: the alleged failings Plaintiffs plead are "in addition to, or different than," the requirements that FSIS has imposed regarding employee hygiene, infectious disease, and sanitation—and therefore are preempted under the express terms of 21 U.S.C. §§ 467e and 678.

**Plaintiffs cite the wrong preemption provision.** Plaintiffs focus on an irrelevant preemption provision regarding "[m]arking, labeling, packaging, [and] ingredient requirements" and argue that the FMIA and PPIA preemption provisions only preempt state law regarding "the inspection, handling, and slaughter of livestock for human consumption." [Mot. at 18 (quoting *Harris*, 565 U.S. at 455)] But "plaintiffs here are only cherry-picking one portion of the preemption clause," while "[t]hey ostensibly ignore the opening of the clause, which prohibits state-law requirements 'with respect to premises, facilities and operations.'" *Fields*, 2021 WL 510620, at *5. And the FMIA and PPIA absolutely regulate and protect people. The Acts' regulation of "sanitary conditions" (21 U.S.C. § 608; *see also id.* § 456(a)) applies to individuals working at meat-processing facilities, not just the animals they process. And its preemptive scope applies broadly to state laws governing the "premises, facilities and operations" of meat- and poultry-processing companies. 21 U.S.C. §§ 467e, 678. A Court within this District recently confirmed as much:

> This is not a typical workplace injury case such as a slip and fall that falls outside of the scope of the FMIA's preemption provision. . . . Instead, this case arose in the unique context of a global pandemic. Workplace conditions and procedures related to disease prevention implicate food safety, which could bring Plaintiffs' claims under the ambit of the FMIA.

*Wazelle*, 2021 WL 2637335, at *3; *see also Fields*, 2021 WL 510620, at *5. Preemption

applies wherever Plaintiffs seek to impose, as a matter of state law, different require-ments for meat-processors than those adopted by the Department of Agriculture.

Plaintiffs are similarly incorrect to assert that the Acts never preempt claims involving "worker safety at meatpacking plants." [Mot. at 17] Although "state laws of general application . . . will *usually* apply to slaughterhouses," the "word 'usually' implies that sometimes the FMIA does preempt state workplace safety regulations." *Wazelle*, 2021 WL 2637335, at *2 (quoting *Harris*, 565 U.S. at 467 n.10 (emphasis added)). And the statutory term "requirements" includes common-law tort duties: Be-cause "common-law liability is 'premised on the existence of a legal duty,'" "a tort judgment therefore establishes that the defendant has violated a state-law obliga-tion" and is a "requirement" for preemption purposes. *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 522 (1992)).

By their express terms, the FMIA and PPIA preempt state-law requirements that fall within the scope of the Acts. 21 U.S.C. §§ 467e, 678; *Harris*, 565 U.S. at 459-60. Employee sanitation—and infectious diseases in particular—are *squarely* within the FMIA and PPIA's scope, as evidenced by the FSIS's regulation of the subject. At the very least, everything Tyson has asserted regarding preemption is well beyond "colorable," and that suffices for obtaining a federal forum. *See Wazelle*, 2021 WL 2637335, at *2-3; *Fields*, 2021 WL 510620, at *5.

**Conflict Preemption and Immunity under the DPA and the extensive federal directives.** At federal direction, and under extensive federal supervision and control, Tyson was required to continue operating its meat and poultry processing facilities in March and April 2020—including the Center and Sherman facilities. Those federal directives, issued after the President had invoked the DPA, preempt any attempt by the states to strike a different policy balance between securing the national food sup-ply and stemming the spread of COVID-19.

The DPA grants the President "an array of authorities . . . to take appropriate steps to maintain and enhance the domestic industrial base," 50 U.S.C. §4502(a)(4),

including the extraordinary power to "allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate" in cases of national emergency, *id.* § 4511(a). As explained above, the Executive Branch can exercise authority under the DPA through informal directives and "means of persuasion" just as well as through formal orders, *see E. Air Lines*, 532 F.2d at 994, and that is precisely what it did here. It is "simply implausible that Congress would have gone to such lengths to empower the President if it had been willing to compromise his effectiveness by deference to every provision of state [law] that might, if enforced, blunt the consequences of discretionary Presidential action." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 376 (2000). The President's decisions "represent[] a national response to a specific problem of 'truly national' concern." *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1078-79 (D.C. Cir. 2003). Because "the purpose of the [DPA] cannot otherwise be accomplished" while allowing states to implement their own, potentially inconsistent policy decisions for meat and poultry processor operations during the COVID-19 pandemic, "the state law must yield." *Savage v. Jones*, 225 U.S. 501, 533 (1912).

Moreover, Tyson's compliance with those federal directives as to whether and how it should continue to operate its facilities entitle it to immunity from Plaintiffs' claims under 50 U.S.C. §4557. Plaintiffs' Motion does not address this argument, and Plaintiffs' only response to Tyson's preemption defense is to repeat their incorrect assertion that Tyson is relying exclusively on the President's April 28 executive order. [Mot. at 17] As explained above, that timing argument fails in light of the "critical infrastructure" designations and other federal directions from the outset of the national emergency.

At the very least, the fact that the DPA "plausibly shields" Tyson from liability, *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001), is sufficient to show a colorable federal defense and justify federal-officer removal.

23

II.   **The Court has federal question jurisdiction because Plaintiffs' claims necessarily raise substantial and disputed issues of federal law.**

This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims (1) "necessarily" raise an issue of federal law that is (2) "actually disputed" and (3) "substantial," (4) "which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005); *Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 721-22 (5th Cir. 2017); *Wullschleger v. Royal Canin U.S.A., Inc.*, 953 F.3d 519, 521 (8th Cir. 2020).

Plaintiffs assert that Tyson should not have complied with federal directions related to the national defense (*i.e.*, should have shut down or slowed production at the facilities (*see* Compl. ¶¶ 9, 30(e), 42(f)-(g), (q) & (nn), 68, 74(a)-(b) & (l)); should have taken more or different measures than were mandated by the federal directives (*e.g.*, *id.* ¶¶ 30, 42(pp)); or failed to comply with federal law by allegedly failing to take certain precautions (*e.g.*, *id.* ¶ 42(h)-(k) & (v), 74(f) & (j)). These issues directly implicate the "uniquely federal interest" in "civil liabilities" arising from the government's defense priorities determinations, *Boyle v. United Technologies Corp.*, 487 U.S. 500, 506-07 (1988), and there is accordingly a "clear interest" in "the availability of a federal forum" to address them, *Grable*, 545 U.S. at 319-20. Further, none of these issues can "be resolved without a determination" and "construction of [the] federal law[s]" under which Tyson was operating. *Bd. of Comm'rs of Se. La.*, 850 F.3d at 723.

Invoking the well-pleaded complaint rule, Plaintiffs argue that their "causes of action are made entirely in terms of state law—specifically, for Texas common law negligence and fraudulent misrepresentation." [Mot. at 19] But "simply because they appear[] in state raiment" does not rule out removal under *Grable*, *see Grable*, 545 U.S. at 314; a "federal cause of action" is a "sufficient condition for federal-question jurisdiction," not a "necessary one," *id.* at 317. Instead, Section 1331 embodies the

24

"commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.* at 312. That is precisely the case here.

Multiple federal issues are plainly raised by the complaint (*e.g.*, Compl. ¶¶ 27(j), (s) (citing the President's emergency declaration and the Food Supply Chain Resources Executive Order), 27(e)-(h), 42(h)-(k) & (v), 74(f) & (j)), and they permeate every aspect of Plaintiffs' claims—from the measures Tyson allegedly adopted or failed to adopt (*e.g.*, *id.* ¶¶ 27(e)-(h) (discussing CDC and OSHA guidelines), 42(h)-(k) (alleging Tyson "[i]gnore[ed] guidance from the CDC and OSHA"), 42(v) (alleging Tyson "[v]iolat[ed] OSHA regulations . . . related to the use of PPE"), 74(f) & (j) (alleging Tyson violated "OSHA and CDC guidance regarding COVID-19")), to Tyson's decision not "to close Tyson Foods facilities for extended periods," in contravention of federal directives (*id.* ¶ 74(a); *see also id.* ¶¶ 29, 30(e), 42(f)-(g), (q) & (nn), 68, 74(a)-(b) & (l)).

Notwithstanding Plaintiffs' attempt to cast their claims in terms of state law, the "validity of [Plaintiffs'] claims would require that conduct subject to an extensive federal . . . scheme is in fact subject to implicit restraints that are created by state law." *Bd. of Comm'rs of Se. La.*, 850 F.3d at 724. Thus, determining liability will have "significant" implications "for the federal regulatory scheme" regarding critical infrastructure during a national emergency. *Id.*; *see also Scrogin v. Rolls-Royce Corp.*, No. 3:10cv442 (WWE), 2010 WL 3547706, at *3 (D. Conn. Aug. 16, 2010) ("[P]laintiffs' state tort claims give rise to serious federal interests in the government procurement contract and military operations."); *McMahon v. Presidential Airways, Inc.*, 410 F. Supp. 2d 1189, 1201-02 (M.D. Fla. 2006) (holding that "the federal issues [were] quite substantial" where national defense and procurement were implicated).

## CONCLUSION

For the foregoing reasons, Tyson respectfully submits that the motion to remand should be denied.

25

Dated: July 13, 2021                           Respectfully submitted,


                                              /s/ Christopher S. Coleman
                                              Zachary T. Mayer
                                              Texas Bar No. 24013118
                                              J. Edward Johnson
                                              Texas Bar No. 24070001
                                              Brandon W. Maxey
                                              Texas Bar No. 24092777
                                              **MAYER LLP**
                                              750 N. St. Paul Street - #700
                                              Dallas, Texas 75201
                                              Telephone:  214.379.6900
                                              Facsimile:   214.379.6939
                                              Email: zmayer@mayerllp.com
                                                     ejohnson@mayerllp.com
                                                     bmaxey@mayerllp.com


                                              Christopher S. Coleman
                                              (Admitted *Pro Hac Vice*)
                                              Jessica L. Everett-Garcia
                                              (Admitted *Pro Hac Vice*)
                                              **PERKINS COIE LLP**
                                              2901 N. Central Avenue, Suite 2000
                                              Phoenix, Arizona 85012
                                              Telephone: 602.351.8000
                                              Facsimile: 602-648.7000
                                              Email: CColeman@perkinscoie.com
                                                     JEverettGarcia@perkinscoie.com

                                              **ATTORNEYS FOR TYSON FOODS,
                                              INC. AND TYSON FRESH MEATS,
                                              INC.**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been served upon all counsel of record, via First Class U.S. Mail and through the Court's CM/ECF system, on July 13, 2021, as follows:

Jill K. Nicaud
**SHRADER & ASSOCIATES, L.L.P.**
9 Greenway Plaza, Suite 2300
Houston, Texas 77046
jill@shraderlaw.com

Lisa Blue Baron, PhD, JD
**BARON AND BLUE**
25 Highland Park Village
Dallas, Texas 75225
lblue@baronandblue.com

Kirsten M. Castañeda
**ALEXANDER DUBOSE & JEFFERSON LLP**
8144 Walnut Hill Lane, Suite 1000
Dallas, Texas 75231-4388
kcastaneda@adjtlaw.com

***ATTORNEYS FOR PLAINTIFFS***

Stan Thiebaud
Pamela Tronzano
**THIEBAUD REMINGTON THORNTON BAILEY LLP**
4849 Greenville Avenue
Suite 1150
Dallas, Texas 75202
sthiebaud@trtblaw.com
ptronzano@trtblaw.com

***ATTORNEYS FOR DEFENDANT AXIOM MEDICAL CONSULTING, LLC***

Ernest W Leonard
**FRIEDMAN & FEIGER LLP**
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
eleonard@fflawoffice.com

***ATTORNEYS FOR DEFENDANT COMMUNITY CARE HEALTH NETWORK LLC d/b/a MATRIX MEDICAL NETWORK***

27

Zachary T. Mayer
J. Edward Johnson
Brandon W. Maxey
**MAYER LLP**
750 N. St. Paul Street - #700
Dallas, Texas 75201
zmayer@mayerllp.com
ejohnson@mayerllp.com
bmaxey@mayerllp.com

***ATTORNEYS FOR DEFENDANT TRANSPLACE TEXAS, LP***


                              /s/ Christopher S. Coleman